# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## MACON DIVISION

|  |  |
|---|---|
| **WALTER G. CARTER, JR.,** | |
| *Plaintiff,* | **CIVIL ACTION NO.** |
| **v.** | **5:23-cv-00210-TES** |
| **FRANK KENDALL,** | |
| *Defendant.* | |

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Walter G. Carter, Jr., brought this employment discrimination action against Defendant Frank Kendall, in his official capacity as the Secretary of the Air Force, under the federal-sector provision of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e–2000e-17, and the Age Discrimination in Employment Act of 1967 (the "ADEA"), 29 U.S.C. §§ 621–634.[1] [Doc. 1, pp. 1–7]. Plaintiff alleges that he was not selected for a promotion due to his race and age. [*Id.*]. Defendant seeks summary judgment on both claims. *See* [Doc. 22]. Because the Court finds that no genuine disputes of material fact exist and that Defendant is entitled to

---

[1] It appears that Plaintiff may have also attempted to assert a claim under 42 U.S.C. § 1981. *See* [Doc. 1, p. 1]. Section 1981 provides relief for claims against state actors, but not against "federal defendant[s] acting under color of federal law." *Lee v. Hughes*, 145 F.3d 1272, 1277 (11th Cir. 1998). Because a § 1981 claim is not legally cognizable in this context, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 22] as to any such claim.

judgment as a matter of law, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 22].

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the [non-movant].'" *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

As to issues for which the *movant* would bear the burden of proof at trial, the "movant must affirmatively show the absence of a genuine issue of material fact[] and support its motion with credible evidence demonstrating that no reasonable jury could find for the non-moving party on all of the essential elements of its case." *Landolfi v. City of Melbourne*, 515 F. App'x 832, 834 (11th Cir. 2013) (citing *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993)).

As to issues for which the *non-movant* would bear the burden of proof at trial, the movant may either (1) point out an absence of evidence to support the non-movant's case or (2) provide "affirmative evidence demonstrating that the [non-movant] will be unable to prove its case at trial." *Four Parcels*, 941 F.2d 1428, 1438 (11th Cir. 1991) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)). If the movant satisfies its burden, the

burden shifts to the non-movant, who must "go beyond the pleadings[] and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

In considering a motion for summary judgment, courts must accept the evidence presented by the non-movant as true and draw all justifiable inferences in its favor. *Liberty Lobby*, 477 U.S. at 255. However, courts are not required to draw "all possible inferences" in favor of the non-movant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011). "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." *Tullius v. Albright*, 240 F.3d 1317, 1320 (11th Cir. 2001).

## BACKGROUND

Having reviewed the record in the light most favorable to Plaintiff, *see Liberty Lobby*, 477 U.S. at 255, the Court finds the facts to be as follows.

### A.    Factual Background

Plaintiff, a black man born in 1977, works as a civilian employee of the United States Air Force. [Doc. 33-1, ¶ 1].[2] He applied for a promotion in early 2019, but David Elsworth, a white employee, five years younger, was selected over him. [*Id.* at ¶¶ 10, 25]. Since 2007, he's worked as a Nondestructive Tester ("Tester") in the

---

[2] Unless otherwise noted, the Court cites to Plaintiff's Response to Defendant's Statement of Material Facts, as that document contains the facts material to this case as well as any disputes over them. *See* [Doc. 33-1].

Nondestructive Inspection Department (which inspects military aircraft for structural damage) at Robins Air Force Base. [*Id.* at ¶¶ 1, 3]. At the time relevant to this case, the Department was comprised of approximately 15–30 employees, around 3–8 of whom were African American.[3] [*Id.* at ¶¶ 4–5].

In early 2019, the Department announced a job opening for the position of NDT Leader, a position that was created to serve as an intermediary between its Testers and Supervisors. [*Id.* at ¶ 7]. According to the announcement, applicants would "be rated in accordance with the OPM Qualification Standard Handbook X-118C for the WG-3700 Metal Processing Family" and their qualification for the position would be evaluated based on the applicant's "[t]echnical practices," as well as their ability to "interpret instructions, specifications, etc.," "lead and supervise," and "use and maintain tools and equipment." [*Id.* at ¶ 9].

The hiring process for this position included three steps. First, a staffing specialist reviewed applicants' resumes and placed eligible applicants on a "Certificate of Eligibles." [*Id.* at ¶ 14]. Second, the Resource Advisor, who acts as a

---

[3] Defendant states that in early 2019 "the [Department[ was comprised of approximately 15 to 20 employees," "three to four of [whom] were black." [Doc. 22-1, ¶¶ 4–5]. Plaintiff, on the other hand, claims that there were "30–40 employees at that time," "approximately 8 [of whom] were [b]lack." [Doc. 33-1, ¶¶ 4–5]. Whether the Department had 15 employees, one-fifth of whom were black, or 40 employees, one-fifth of whom were black, the analysis is the same. *See Four Parcels*, 941 F.2d at 1438 (quoting *Anderson*, 477 U.S. at 248). Thus, no genuine dispute exists as to the demographics of Defendant's employees during the relevant time period. *See* Fed. R. Civ. P. 56.

liaison between the staffing agency and the squadrons, and a member of upper management within the Department scored each candidate's resume (out of 100 possible points) according to internal scoring criteria. [*Id.* at ¶¶ 16–18]. Third, candidates interviewed with a panel and received a score out of a maximum 200 points. [*Id.* at ¶ 19]; *see* [Doc. 33-20].

### 1.    Step One: Eligibility Determination

Plaintiff applied for the NDT Leader position on February 28, 2019. [Doc. 33-1, ¶ 10]. At the time of his application, he had extensive experience as a Tester, having worked in the field for over 17 years, held multiple NDI certifications, and he had also served as an alternate supervisor, training and mentoring other Testers. [*Id.* at ¶ 6]. Angela Griffiths, the staffing specialist who reviewed Plaintiff's application and resume first, determined that his resume met the qualifications for the position, and she added him to the Certificate of Eligibles. *See* [*id.* at ¶ 29]

Elsworth, a white employee with five years of experience as a Tester, also applied for the NDT Leader Position.[4] [*Id.* at ¶ 25]. Elsworth also applied for the

---

[4] In establishing the background facts of this dispute, Defendant states that the "Nondestructive Tester Leader . . . position served as an intermediary between the NDI Supervisors and the NDI Testers." [Doc. 22-2, ¶ 7]. Plaintiff purports to dispute that, claiming that "Mr. Elsworth testified that the NDT Leader's primary responsibility is training and mentoring other technicians." [Doc. 33-1, ¶ 7]. Plaintiff cites to a portion of Mr. Elsworth's deposition transcript in which Elsworth was simply responding to a question about how "the role of NDT [L]eader . . . is . . . affected by [NDI level] certifications." But it gets worse.

higher-ranking position of NDT Supervisor around the same time. [*Id.* at ¶ 25]. Elsworth's application for the higher-ranking position was reviewed by Kathleen Prater, a staffing specialist with almost 20 years of experience, whereas his application for the NDT Leader position was (like Plaintiff's) reviewed by Angela Griffiths. [*Id.* at ¶¶ 26, 29]. Prater acknowledged that Elsworth's "resume [was] very weak," but she determined that he was nonetheless eligible for the higher-ranking NDT Supervisor position. [Doc. 24-2, p. 3]. Griffiths, on the other hand, deemed him *ineligible* for the lower-ranking NDT Leader position, even though she "could tell . . . [that] he probably [was] qualified," and excluded him from the Certificate for that position. [*Id.* at p. 2]. These inconsistent eligibility determinations were, in the words of the Resource Advisor, "baffling." [Doc. 27-1, p. 1].

When Elsworth did not make the Certificate for the NDT Leader position, he asked the NDI Production Team Lead, Patrick Rudolph, why that might be. [Doc. 33-1, ¶ 27]. Rudolph took the issue up with Squadron Director James Kelly, who directed him to ensure that Elsworth was interviewed for the NDT Leader position, given that he had been certified as eligible for the higher-ranking NDT Supervisor position.

---

For reasons that are difficult to understand, Plaintiff cherry-picked the second half of Elsworth's answer, the first half of which—mind you, on the same page and directly above the portion Plaintiff cites—discusses the NDT Leader's role as an intermediary between the NDI Supervisors and the NDI Testers—exactly as Defendant stated. *See* [Doc. 25, Elsworth Depo., p. 35:20–25]. What's more, although Elsworth describes the NDT Leader as "the number one trainer for the technicians in that particular department," he says nothing that could be read to imply that "the NDT Leader's primary responsibility is training and mentoring other technicians." [Doc. 25, Elsworth Depo., p. 35:20–25; *see* [Doc. 33-1, ¶ 7].

[Doc. 22-2, ¶ 28].

The Resource Advisor, Millicent Stillman, emailed Griffiths on Rudolph's behalf, to ask whether Elsworth had applied for the NDT Leader position and, if so, why he was deemed ineligible. [Doc. 33-1, ¶ 29]; [Doc. 27-1, p. 2]. Griffiths responded that she deemed Elsworth ineligible because he "needs to beef [his resume] up." [Doc. 33-1, ¶ 30]. As the matter continued up the chain of command, Ramona Sinyard emailed Griffiths and Prater, asking "why [Elsworth] wasn't" deemed eligible for the NDT Leader position, given that he "has experience and certification in 5 of the NDI methods on 4 different aircraft[]." [Doc. 24-2, Griffiths Depo., p. 5].

Prater provided Sinyard a detailed response (including the language of the assessment and the job announcement), and she explained that she deemed Elsworth eligible for the Supervisor position based on three items listed on his resume. [*Id.* at pp. 3–4].[5] In contrast, Griffiths offered a more terse reply: "[Prater] is one person and I am a different one." [*Id.* at p. 2]. While other parts of his application suggested that he was "probably qualified," his resume did not "specify what he does in his job," and in Griffiths' view, that cut against his eligibility. [*Id.* at pp. 2–3].

Sinyard commented that "it still [didn't] seem logical" for Elsworth to be eligible for the Supervisor position but not the lower NDT Leader position. [*Id.* at p.

---

[5] The NDI Production Team Lead, Patrick Rudolph, likewise found that Elsworth was qualified for the position based on his resume. [Doc. 33-1, ¶ 46].

3]. So, she elevated the matter to the Chief of Human Resources Management, Mr. Stacy Wood, who reviewed the staffing specialists' reasoning for their different eligibility determinations, expressed concern with the inconsistency, and stated that "adding Elsworth to the certificate for consideration" was "the right thing to do." [*Id.* at ¶ 31]; [Doc. 24-2, p. 1]. As directed, Griffiths added Elsworth to the Certificate for the NDT Leader position.[6] [Doc. 33-1, ¶ 32].

### 2.    Step Two: Resume Scoring

The Resource Advisor NDI Production Team Lead scored the resumes and

---

[6] Plaintiff disputes Defendant's position that Elsworth's addition to the Certificate of Eligibles was "[a]s a result of" the issue being elevated to the Chief of Human Resources Management. [Doc. 22-1, ¶ 32]. He contends that "[t]he record remains unclear as to exactly why Elsworth was added to the Certificate" and that "Defendant's witnesses state that Ms. Griffiths made the decision to add Mr. Elsworth to the Certificate." [Doc. 33-1, ¶ 32].

The record is plenty clear that Elsworth's inquiry into his exclusion from the Certificate set off a series of events that culminated in the Chief of Human Resources Management advising that Elsworth should be added to the Certificate. While two witnesses testified that Griffiths made the decision to add Elsworth, their testimony was clearly speculative, and neither witness suggested that Griffiths acted independently. [*Id.*]. For instance, the Resource Advisor explained that "Griffiths . . . would be the only one who would have the authority to actually add the person to the certificate *once it's been decided, I suppose, through my senior leadership and her senior leadership. It may have been advised to her to add them* to it because she did." [Doc. 27, Stillman Depo., p. 28:19-25]. Similarly, the Flight Chief testified, "[f]rom [his] understanding, it was [Griffiths]" who made the decision. [Doc. 30, Singleton Depo., p. 33:5]. These statements do not demonstrate first-hand knowledge, and they are speculative at best. *See* Fed. R. Evid. 602.

Even if this testimony were not speculative, it fails to create a genuine dispute of fact as to how Elsworth's name was ultimately added to the Certificate. The record consistently shows that the decision was the result of a collaborative process involving senior leadership, not an independent or unilateral action by Griffiths.

determined that Plaintiff and Elsworth were both eligible to interview.[7] [Doc. 33-1, ¶ 35]; [Doc. 27-3, p. 2]. Plaintiff received 81 points for his resume, and Elsworth received 78 points. [Doc. 33-1, ¶¶ 39, 40].

### 3.    Step Three: Interviewing

The interview panel consisted of two interviewers from inside the Department—Patrick Rudolph and NDI Supervisor Laurie Jaramillo (née Gibbs)—and one interviewer from outside the Department—Quality Assurance Chief Michael Williams. [*Id.* at ¶ 20]; [Doc. 22-1, p. 1 n.1]. At the beginning of each interview, a list of questions was removed from an envelope and given to the candidate and panel members. [Doc. 33-1, ¶¶ 20–21]. The candidate then reviewed the questions for 15 minutes before returning to the interview room to provide their answers to the panel members for another 15 minutes. [*Id.* at ¶¶ 22–23]. The panel members then rated the candidate's answers based on objective scoring criteria contained in a rubric and collected all paperwork from the candidate before they left the room. [*Id.* at ¶ 24].

---

[7] Plaintiff disputes Defendant's assertion that "Mr. Rudolph scored the experience portion of the resumes." [Doc. 33-1, ¶ 34]. However, the deposition testimony Plaintiff cites does not support his position. In his deposition, Rudolph stated that he did not review Elsworth's resume during step one of the process: "I know, based on the process, that . . . to get [it] looked at in order for him to be put on [the Certificate of Eligibles], but I know I didn't look at it." [Doc. 28, Rudolph Depo., p. 53:15–17]. This statement doesn't "specifically controvert[]" Defendant's assertion that Rudolph scored the experience portion of Elsworth's resume during step two of the process. *See* [Doc. 22-2, ¶ 34]; LR 56, MDGa.

Moreover, Defendant's statement is corroborated by the testimony of the Resource Advisor, who confirmed that Rudolph scored the experience portion at step two. [Doc. 27, Stillman Depo., p. 45:2-11]. Plaintiff's cited evidence fails to create a genuine dispute of fact on this point.

Plaintiff sat for his interview on March 28, 2019. [*Id.* at ¶ 36]. But by the time Elsworth was deemed eligible to interview, Williams (the outside panel member) was out of town, so the panel waited until he returned and interviewed Elsworth on April 10, 2019. [*Id.* at ¶ 37].

The panel found Elsworth's ability to articulate his knowledge to be consistently stronger than Plaintiff's. *See* [*id.* at ¶ 47]. He went into detail about the equipment that Testers use, discussed the procedures they follow when they inspect aircraft, explained how he implements the Department's problem-solving process,[8] and described his experience leading and training other employees. [*Id.*]. By contrast, Plaintiff provided less detail about the equipment and procedures, didn't "walk [the interviewers] through the inspection" process, "didn't really elaborate" on the problem-solving framework, and "really didn't talk about leading employees." [*Id.*]; [Doc. 28, Rudolph Depo., pp. 28:16–23, 32:8-9, 35:14–16, 38:18-20]; [Doc. 26, Jaramillo Depo. pp. 32:3–8, 37:9-10]. The outside interviewer, Williams, stated that he "scored the interview based on [Plaintiff's] answers to the questions," and he provided scores similar to those provided by the other panel members. [Doc. 33-1, ¶ 48]. Elsworth's performance earned 184 points compared to Plaintiff's 126. [*Id.* at ¶¶ 39–40].

Combined with their resume scores, Elsworth's total score of 262 exceeded

---

[8] The record repeatedly refers to "the Art of the Possible," which the Court gathers is a problem-solving process used in the NDI Department, the details of which are unimportant to this analysis.

Plaintiff's total of 207. [*Id.*]. As a result, Plaintiff ranked below Elsworth, the top-scoring candidate ultimately selected for the position. [*Id.*].

**B.**    **Procedural Background**

Plaintiff filed an administrative complaint with the Department of the Air Force (the "Air Force") in January 2020. [Doc. 1, ¶ 7]. The Air Force issued a Final Agency Decision ("FAD") in October 2021 finding that "the agency articulated legitimate, nondiscriminatory reasons for its challenged actions that were not proven by a preponderance of the evidence to be a pretext for discrimination based on race, color, or age." [Doc. 22-9, p. 8]; [Doc. 1, ¶ 8]. Plaintiff appealed the FAD to the Equal Employment Opportunity Commission, which affirmed the Air Force's decision in March 2023 and provided Plaintiff with notice of his right to file a civil action. [Doc. 22-10]; [Doc. 1, ¶¶ 10–11].

Plaintiff then filed this lawsuit on June 14, 2023. *See* [Doc. 1]. In his two-count Complaint, Plaintiff asserts a race discrimination claim under Title VII (Count 1) and an age discrimination claim under the ADEA (Count 2). [*Id.* at p. 7].

## DISCUSSION

Defendant moves for summary judgment on both claims. Defendant contends that Plaintiff's claims are "based on bare assertions and speculation," that they lack evidentiary support, and that Plaintiff has abandoned his age-discrimination claim. [Doc. 22-1, p. 10]; [Doc. 37, pp. 1–2]. The Court agrees with Defendant on both grounds.

A.    <u>**No Genuine Disputes of Material Fact**</u>

As a preliminary matter, the Court finds that no "genuine dispute as to any material fact" stands in the way of summary judgment in this case. *See* Fed. R. Civ. P. 56(a).

Under Local Rule 56, a party opposing summary judgment must respond to each fact set forth in the movant's Statement of Material Facts *and* "attach to [its] response a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine dispute to be tried." LR 56, MDGa.

If the non-movant fails to "specifically controvert[]" any fact by providing "specific citation to particular parts of materials in the record," that fact "shall be deemed to have been admitted, unless otherwise inappropriate." *Id.* These procedural requirements help conserve judicial resources by requiring parties to organize their evidence and focus the Court's attention on any genuinely disputed facts. *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (citations omitted).

Here, although Plaintiff responded to Defendant's Statement of Material Facts, he didn't file his own separate statement of disputed material facts as required by Local Rule 56. *See* [Doc. 33]; LR 56, MDGa. While Plaintiff's Response identifies disputes regarding a few facts asserted by Defendant, none of these disputes are material. *See* [Doc. 33-1, ¶¶ 39, 53–54]. Plaintiff's remaining efforts to demonstrate factual disputes fail to "specifically controvert[]" the facts as stated by Defendant. *See* [Doc. 33]; LR 56,

MDGa. Thus, except for the first sentence of paragraph 39 and paragraphs 53–54, the Court "deem[s]" Defendant's Statement of Material Facts admitted. LR 56, MDGa; Fed. R. Civ. P. 56(e); *see* [Doc. 22-1].

Instead of filing his own separate statement of disputed material facts, Plaintiff embedded a section titled "Statement of Disputed Material Facts" within his Response brief. [Doc. 33, pp. 2–10]. However, even a cursory review of that section reveals that the facts presented are not disputed—for example, the parties agree (not dispute) that Plaintiff is an African American, was born in 1977, has worked as a NDT since 2002, and began working for Defendant in 2007. [*Id.* at pp. 2–3, ¶¶ 1–2]; *see* [Doc. 22-2, ¶¶ 2, 6]. The Court declines to sift through the record on Plaintiff's behalf or reorganize the evidence in search of additional factual disputes. *See Reese*, 527 F.3d at 1268; [Doc. 33, pp. 2–10]; LR 56, MDGa.

Before diving into the substance of Plaintiff's claims, the Court first narrows the issues.

**B.    Plaintiff Abandoned his ADEA Claim**

To begin, the Court finds that Plaintiff abandoned his age-discrimination claim. *See* [Doc. 1, ¶¶ 58–62]. "In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him." *Clark v. City of Atlanta*, 544 F. App'x 848, 855 (11th Cir. 2013) (quoting *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). "[T]he onus is upon the parties to formulate arguments; grounds

alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.*; *cf. Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (citing *Fehlhaber v. Fehlhaber*, 681 F.2d 1015, 1030 (5th Cir. 1982) ("[F]ailure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."). "Failure to respond to the opposing party's summary judgment arguments regarding a claim constitutes an abandonment of that claim and warrants the entry of summary judgment for the opposing party." *Burnette v. Northside Hosp.*, 342 F. Supp. 2d 1128, 1140 (N.D. Ga. 2004).

Here, Plaintiff's Response fails to offer any substantive arguments supporting his claim under the ADEA. *See* [Doc. 22-1]; [Doc. 33]. He does not articulate the legal framework for such a claim, cite to the statute, or point to any evidence suggesting that his age played any role in Defendant's decision not to promote him. *See* [Doc. 33].

Instead, Plaintiff makes only three brief references to age. *See, e.g.,* [*id.* at pp. 14, 17, 18]. Even if these statements were enough to establish a claim under the ADEA—which they are not—they are unaccompanied by legal analysis and are unsupported by evidence in the record, so they are insufficient to withstand summary judgment. *See* [*id.* pp. 14, 17, 18].

Thus, Plaintiff abandoned his ADEA claim by failing to support it with legal analysis or evidence and by failing to adequately respond to Defendant's arguments. *Clark*, 544 F. App'x at 855 (quoting *Resol. Tr. Corp.*, 43 F.3d at 599). But even if Plaintiff

had not abandoned this claim, it would fail on the merits due to the same lack of evidence that undermines his race discrimination claim, as explained below. *See infra* note 13.

### C.    **Plaintiff's Title VII Claims**

Next, the Court considers Plaintiff's race discrimination claim under Title VII. *See* [Doc. 1, ¶¶ 53–57]. Under the federal-sector provision of Title VII, "personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be free from any discrimination based on race . . . or national origin." 42. U.S.C. § 2000e-16(a). This means that "personnel actions must be made in 'a way that is not tainted by differential treatment based on' a protected characteristic." *Terrell v. Sec'y, Dept. of Veterans Affs.*, 98 F.4th 1343, 1352 (quoting *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1199 (11th Cir. 2021)).[9]

Thus, to survive summary judgment, Plaintiff must make a sufficient factual showing to permit a reasonable jury to find that his race (or age) "play[ed] any role" in, or "tainted," the hiring process.[10] *Id.*; *see Lewis v. City of Union City*, 918 F.3d 1213, 1217

---

[9] "[T]he *McDonnell-Douglas* framework and the 'convincing mosaic' test . . . they 'no longer apply' to cases brought under the federal-sector provision of Title VII" because those "are methods used to show that a protected characteristic was the but-for cause of the ultimate decision." *Durr v. Sec'y of Dept. of Veterans Affs.*, No. 21-12867, 2022 WL 2315086 (11th Cir. June 28, 2022) (citing *Durr v. Sec'y of Dept. of Veterans Affs.*, 843 F. App'x 246, 247 (11th Cir. 2021)). Plaintiff must only "show that discrimination played a[] part in the way the decision was made." *Terrell*, 98 F.4th 1343, 1352 (quoting *Babb*, 992 F.3d at 1199).

[10] The same standard governs claims under the ADEA's nearly identical federal-sector provision. *Babb*, 992 F.3d at 1198; *see* 29 U.S.C. § 633a(a).

(11th Cir. 2017) ("Faced with a defendant's motion for summary judgment, a plaintiff asserting an intentional-discrimination claim under Title VII . . . must make a sufficient factual showing to permit a reasonable jury to rule in [his] favor."). However, "even if [Plaintiff] proves that [unlawful] discrimination tainted the decision-making process, he is not necessarily entitled to all remedies." *Terrell*, 98 F.4th at 1352 (quoting *Buckley v. Sec'y of Army*, 97 F.4th 784, 793 (11th Cir. 2014)). A showing that the hiring process was merely tainted by a discriminatory animus only entitles a plaintiff to "injunctive or other forward-looking relief." *Id*. To obtain retrospective relief, such as compensatory damages and backpay, a federal employee must still prove that discrimination was the "but-for cause of [his] non-selection." *Id*.

Defendant argues that Elsworth was selected through a fair and objective hiring process and that Plaintiff can point to no evidence supporting his claims that race or age discrimination tainted that process. *See* [Doc. 22-1]. Plaintiff relies on *Bass v. Board of County Commissioners* to argue that Defendant's proffered reason for selecting Elsworth is pretextual, evidenced by procedural irregularities, Defendant's reliance on subjective interview scores, Plaintiff's superior qualifications for the position, and a broader pattern of discriminatory practices within the NDI Department. *See* [Doc. 33, p. 12]; *Bass*, 256 F.3d 1095 (11th Cir. 2001), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008). To be sure, the existence of non-pretextual reasons for Defendant's actions doesn't negate the presence or taint of discriminatory

considerations, but Plaintiff fails to meet his burden "of proving either 'discriminatory considerations' or their 'taint,'" so his "claim[s] based on differential treatment in the hiring process fail[]." *Terrell*, 98 F.4th at 1354 (first quoting *Babb*, 992 F.3d at 1204; and then citing *Buckley*, 97 F.4th at 795).

First, the Court considers whether Plaintiff can demonstrate that unlawful discrimination tainted the hiring process, which would entitle him to prospective relief. *Terrell*, 98 F.4th at 1352. Because Plaintiff fails to satisfy this lower burden, the Court need not consider whether could clear the higher bar required for retrospective relief by showing discrimination was the "but-for cause of [his] non-selection." *Id.*

### 1.    Alleged Procedural Irregularities & Reliance on Interviews

Plaintiff first alleges that Defendant deviated from its established hiring practices by "overrul[ing] the resume reviewer" and "rel[ying] on an improper assessment performed by Prater" to add Elsworth to the Certificate of Eligibles. [Doc. 33, p. 13]. However, Plaintiff fails to establish what the "normal" hiring practice was against which any alleged deviation could be measured. He relies on Griffiths' testimony that a candidate's "resume is supposed to tell [the staffing specialist] everything [they] need to know" to determine whether a candidate is eligible for a position, [*id.* at p. 14], but that is far too vague to establish a clear, consistent hiring routine. *See Monds v. City of Quitman, Georgia*, No. 7:16-cv-130 (HL), 2018 WL 1528212, at *6 (M.D. Ga. Mar. 28, 2018), *aff'd sub nom. Monds v. Quitman Georgia*, 767 F. App'x 750 (11th Cir. 2019).

To the extent that the evidence does show consistent hiring practices, it also shows that Defendant adhered to them in this case. According to Griffiths, "[i]t is standard practice to add additional candidates to certificates prior to a selection being made if there was an error made that excluded an otherwise qualified, eligible candidate from consideration," *see* [Doc. 33-10, p. 2], and the evidence shows that's exactly what happened here. When Elsworth was excluded from the Certificate for the NDT Leader position, Flight Chief Willie Singleton (a black man) directed Resource Advisor Millicent Stillman (a black woman) to contact Griffiths to ascertain why Elsworth was deemed ineligible. [Doc. 33-1, ¶ 29]; [Doc. 27-1, p. 2]. Around the same time, Squadron Director James Kelly (a black man) instructed Rudolph to ensure that Elsworth was interviewed for the NDT Leader position because he had been certified as eligible for the higher-ranking NDT Supervisor position. [Doc. 33-1, ¶ 28].

Human Resources leadership got involved, investigated the eligibility discrepancy, compared the explanations provided by the staffing specialists, and concluded that Elsworth's exclusion from the Certificate was an error. [*Id.* at ¶ 31]. Notably, there is no evidence that the Chief of Human Resources Management knew the race or age of the candidates, and he clearly explained that "adding Elsworth to the certificate for consideration" was just "the right thing to do." [Doc. 24-2, Griffiths Depo., p. 1].

Plaintiff's assertion that "Defendant made *zero* efforts to assess the accuracy" of

Prater's allegedly "improper" resume assessment is unsupported by the evidence. [Doc. 33, p. 13]. Human Resources leadership compared the reasoning provided by both staffing specialists and concluded that Prater's assessment—backed by nearly 20 years of experience—was more compelling. [*Id.* at ¶¶ 28; 31]; [Doc. 24-2, Griffiths Depo., p. 1]. The review process documented in the record underscores Defendant's efforts to ensure the accuracy and fairness of the eligibility determinations, contrary to Plaintiff's assertions.

Plaintiff also exaggerates the irregularity of this process. *See* [Doc. 33, p. 13]. The Resource Advisor testified that additional rounds of interviews are "common" and late additions to Certificates of Eligibles happen with some regularity. [Doc. 27, Stillman Depo., pp. 12:24–13:2; 31:4-14; 61:9]. In fact, she stated in her deposition that she knew of candidates who had been added to a Certificate "just recently . . . within the last four months." [*Id.* at 31:4-14]. To the extent that the evidence shows a normal practice for dealing with this type of situation, which arises infrequently, Defendant acted consistently with that practice. *See* [Doc. 33, p. 13–15].

The reasons for Elsworth's late addition to the Certificate and the decision to conduct a second round of interviews in this case are well-documented in the record, and Plaintiff simply fails to offer any evidence that they were tainted by anyone's race or age. *See Adams v. Fulton Cnty.*, Ga., 397 F. App'x 611, 613 (11th Cir. 2010).

Moving from procedural issues to more substantive allegations of bias, Plaintiff

next claims that Jaramillo "coached Mr. Elsworth in preparation for his . . . interview" and "gave [him] advanced notice of the interview questions." [Doc. 1, ¶¶ 38–39]. However, this allegation rests entirely on speculation. Plaintiff cites his belief that Elsworth needed coaching because he "was not knowledgeable of the duties of the position," his observation that Elsworth "was frequently in [Jaramillo's] office," and office gossip. [Doc. 29-1, p. 4].

Plaintiff also points to information from Orlando Wiley and other colleagues, who told him that Jaramillo gave Elsworth advance notice of the interview questions. However, Wiley's affidavit couldn't be more vague: "I observed that management, particularly our supervisor Laurie [Jaramillo], favored some employees and coached them on how to handle interview questions in order to get them promoted." [Doc. 33-21, ¶ 5]. Even if this scintilla of evidence (which appears to be buried in several layers of hearsay) could be reduced to an admissible form at trial, and even accepting it as true while drawing all justifiable inferences in Plaintiff's favor, it amounts to nothing more than mere conjecture. Wiley's statement fails to provide any concrete details or examples connecting Jaramillo's alleged favoritism to Elsworth's interview process or any specific improper action.

Moreover, the only motivation for any perceived favoritism that finds support in the record is the fact that Elsworth was in the Emerging Supervisors Development Program, and Jarmillo's job included mentoring and training participants in that

program. *See* [Doc. 22-10, p. 4]. Plaintiff presents no admissible evidence that Elsworth

received any preferential treatment from Jarmillo at all, much less preferential

treatment based on Elsworth's race or age. The Court, therefore, cannot follow Plaintiff

in making the unjustifiable and unsupported inferential leap that any favoritism shown

toward Elsworth was the result of unlawful discrimination. *Liberty Lobby*, 477 U.S. at

255; *Horn*, 433 F. App'x 788, 796.

      Furthermore, every witness with first-hand knowledge of the hiring process

clearly rebutted Plaintiff's naked allegations of favoritism. Jarmillo unequivocally

denied these allegations twice—first in a sworn statement during the administrative

investigation and again in her deposition:

> Q:    What do you think was the difference in how these two
> individuals interviewed?
> A:    Elsworth was able to be more specific.
> . . .
> Q:    Do you think that there was anybody who maybe gave
> Mr. Elsworth some advice prior to the interview
> explaining to him how specific he should be in his
> answers?
> A:    Not that I'm aware of. No.

[Doc. 26, Jarmamillo Depo., 31:11–32:16 (cleaned up)]; *see* [Doc. 33-5, p. 5]; [Doc. 33, p.

18]. Elsworth also denied receiving any advance access to interview questions or

materials:

> Q:    Did Jaramillo ever give you any interview questions
> prior to your interview?
> A:    No.
> . . .

> Q:      Did she ever provide you with a resume matrix to help
> you prepare for your interview?
> A:      No.
> . . .
> Q:      Did you ever observe her with the interview
> questions?
> A:      No.
> Q:      What about any general resume matrix?
> A:      No.

[Doc. 25, Elsworth Depo., 44:7–45:3 (cleaned up)]. Other witnesses with first-hand

knowledge of the process, the Resource Advisor and NDI Production Team Lead, also

testified that Jaramillo did not have access to the interview questions. [Doc. 27, Stillman

Depo., p. 68:2-20]; [Doc. 28, Rudolph Depo., p. 81:11-25].

Finally, Plaintiff further argues that interview process itself was a pretext for

discrimination, [Doc. 33, p. 15], but he fails to support that claim with any evidence.

Each panelist independently scored Plaintiff and Elsworth, providing detailed

rationales for their scores. *See* [Doc. 22-12]; [Doc. 22-13]; [Doc. 22-14, p. 32]. The

panelists' scores were remarkably consistent with one another, and Elsworth outscored

Plaintiff on three of the four questions, ultimately earning nearly 50% more points for

his performance. *See* [Doc. 28-2]; [Doc. 28-3].

Plaintiff's assertion that "[t]he interviewers' assessments were inconsistent"

relies on a mischaracterization of Jaramillo's deposition testimony. *See* [Doc. 33, p. 17].

He argues that he caught Jaramillo in a contradiction: in her deposition, Jaramillo

admitted that her notes might not fully capture his response to one of the interview

questions because she "just [wasn't] fast enough to write it down," but then she "quickly adjust[ed] and state[d] that 'it doesn't look like' anything [was] missing" from her notes. [*Id.*]. Plaintiff extrapolates from this testimony that his score may have been unfairly low yet fails to explain how the purported contradiction demonstrates inconsistency in the panelists' assessments. *See* [*id.*].

More alarming, the quoted portion of the deposition transcript upon which Plaintiff stakes his argument clearly shows that Jaramillo wasn't discussing Plaintiff's response—she was referring to Elsworth's. *Compare* [Doc. 26, Jaramillo Depo., pp. 40:11–41:20], *with* [Doc. 28-2, p. 3], *and* [Doc. 28-3, p. 3]. By Plaintiff's own logic, this would suggest that Elsworth was scored unfairly low, not Plaintiff. *See* [Doc. 33, p. 17]. This mischaracterization further highlights the lack of evidence supporting Plaintiff's claim.

Last but not least, the inclusion of an external panelist, who provided similar scores to Rudolph and Jaramillo, only reinforces the objectivity and fairness of the process as a whole.[11] [Doc. 33-1, ¶ 48]. In sum, the evidence shows that the interviews were conducted fairly and objectively, and Plaintiff offers no evidence to support his claims to the contrary. *See Bond v. Cross Rds. Hosp. Co.*, No. 5:05-CV-43-CDL, 2006 WL 3313376, at *8 (M.D. Ga. Nov. 13, 2006).

---

[11] To the extent that Plaintiff challenges witnesses' reliance on notes they took during the interviews, that objection is **OVERRULED**. *See* [Doc. 33-1, ¶ 47]; Fed. R. Evid. 803(1), (5).

### 2.    Plaintiff's Superior Qualifications

Second, Plaintiff argues that his extensive experience and certifications make him significantly more qualified than Elsworth. [Doc. 33, pp. 9–10]. But, even if that were true, Plaintiff may not show discrimination "by simply arguing or even showing that []he was better qualified than [Elsworth]." *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1206 (11th Cir. 2013). Rather, he must show "that the disparities between [Elsworth's] and [his] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen [Elsworth] over [Plaintiff]." *Id.* Plaintiff fails to meet this high standard.

While Plaintiff had 17 years of experience, multiple NDI certifications, and leadership roles, Defendant assigned greater weight to the candidates' ability to articulate their knowledge in their interview as opposed to simply comparing the candidates' relative number of years in their jobs. [Doc. 33, p. 16]; *see* [Doc. 33-20]. Plaintiff makes the critical error of assuming that the candidate with the most experience in the job is necessarily and automatically the best at that job. But, years of experience alone does not equate to greater expertise or a broader knowledge base. If it did, employers would simply just promote the employee who has been there the longest rather than the candidate who's best suited for the job.

As noted above, all three panelists—including an external member—scored Elsworth significantly higher than Plaintiff in the interview process. *See* [Doc. 22-12];

[Doc. 22-13]; [Doc. 22-14, p. 32]. Each panelist independently noted Elsworth's detailed and articulate responses, which, in their individual opinions, demonstrated his technical knowledge and, to them, his leadership potential. [Doc. 33-1, ¶¶ 47–48].

### 3.    Broader Pattern of Discriminatory Practices

Finally, Plaintiff alleges a pattern of promoting white employees within the Department. *See* [Doc. 33, pp. 2, 18–19]. Defendant argues that Plaintiff failed to administratively exhaust several of these "tangential arguments," [Doc. 22-1, pp. 17–18], but because the Court finds that Plaintiff's claims fail on their merits, the Court need not address the issue of exhaustion.

According to Plaintiff, between 2017 and 2019, Defendant promoted eight people to NDT Leader and NDT Supervisor positions, all of whom were white. [Doc. 33, p. 2]. However, Plaintiff fails to draw any connection between these past promotion decisions and the decision at issue in this case—he provides no evidence that the decision-makers involved in this case were influenced by discriminatory animus or that any alleged statistical disparities were a motivating factor in his non-selection. *See Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010).

Plaintiff also contends that Jaramillo disproportionately assigned more strenuous work to black employees, citing this as further evidence of discrimination. [Doc. 1, ¶¶ 46–50]. For example, Plaintiff claims that Jaramillo occasionally asked him to stay late to complete tasks. [Doc. 33, ¶ 37]. However, Plaintiff admitted that he voluntarily agreed

to work extra hours because he "needed the money," and no evidence suggests that these requests were based on race. [Doc. 29, Carter Depo., pp. 77:9–19, 78:6–8]; *see* [Doc. 26, Jaramillo Depo., p. 61:22-25]. Without more, these allegations fall far short of showing discrimination of any kind.

Plaintiff has not made a sufficient factual showing to permit a reasonable jury to find that his race (or age) "play[ed] any role" in, or "tainted" the hiring process, so the Court finds that he is not entitled to prospective relief. *Terrell*, 98 F.4th at 1352 (quoting *Babb*, 992 F.3d at 1199); *see Lewis* 918 F.3d at 1217. Because Plaintiff has not met the lower burden for prospective relief, the Court need not address whether Plaintiff meet the higher burden of showing that discrimination was the "but-for cause of [his] non-selection" to warrant retrospective relief. *Terrell*, 98 F.4th at 1352.

## CONCLUSION

Accordingly, because Plaintiff cannot maintain a § 1981 claim against a federal defendant acting under color of federal law, has abandoned his age-discrimination claim under the ADEA, and has produced no evidence that his race played any role in his non-selection for the position at issue, the Court **GRANTS** Defendant's Motion for Summary Judgment [Doc. 22].

**SO ORDERED**, this 18th day of January, 2025.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**